**FILED**
**CLERK**

9:06 am, Jul 26, 2021

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
                                .
Wendy Gold,                     .  Docket #CV-21-2842 (GRB)(AKT)
                                .
        Plaintiff,              .
                                .  United States Courthouse
        vs.                     .  Central Islip, New York
                                .  July 19, 2021
Eva Naturals, Inc.,             .  10:05 a.m.
                                .
        Defendant.              .
```
.........................................................

**TRANSCRIPT OF PRE-MOTION CONFERENCE**
**BEFORE THE HONORABLE GARY R. BROWN**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

For The Plaintiff:              Joseph Lipari, Esq.
                                The Sultzer Law Group, PC
                                85 Civic Center-Ste. 200
                                Poughkeepsie, NY 12601

                                Mindy Dolgoff, Esq.
                                The Sultzer Law Group, PC
                                270 Madison Ave.-Ste. 1800
                                New York, NY 10016

For The Defendant:              Jacob Harper, Esq.
                                Davis Wright Tremaine, LLP
                                865 S. Figueroa St.-Ste. 2400
                                Los Angeles, CA 90017

                                Mohammad B. Pathan, Esq.
                                Davis Wright Tremaine, LLP
                                1251 6th Ave.-21 St Fl.
                                New York, NJ 10020

                                Peter Bae, Esq.
                                Davis Wright Tremaine, LLP
                                865 S. Figueroa St.-Ste. 2400
                                Los Angeles, CA 90017

Audio Operator:

Transcribing Firm:                 Writer's Cramp, Inc.
                                   1027 Betty Lane
                                   Ewing, NY 08628
                                   609-588-8043


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Index

                                                Further
                        Direct Cross Redirect Recross Redirect

**Witnesses For The**
 **Plaintiff:**




**Witnesses For The**
 **Defendant:**




**EXHIBITS:**                                    <u>Marked</u>   <u>Received</u>








**SUMMATION BY:**




**THE COURT:** Finding      28

1          THE CLERK:  Case #2021-2842, <u>Gold vs. Eva Naturals,</u>

2   <u>Incorporated</u>.  Counsel, please state your appearance for the

3   record.

4          MR. LIPARI:  Good morning, this is Joseph Lipari on

5   behalf of plaintiff Wendy Gold.

6          MR. PATHAN:  Good morning, this is Mohammad Pathan

7   on behalf of Eva Naturals, Inc.

8          THE COURT:  Is that everyone?

9          MR. HARPER:  Good morning, Your Honor, Jacob Harper

10  -- oh, nope.  Good morning, Your Honor.  Jacob Harper, Davis

11  Wright Tremaine, on behalf of defendant Eva Naturals.

12         THE COURT:  Okay, anyone else?

13         MS. DOLGOFF:  Hi, yes, Mindy Dolgoff on behalf of

14  plaintiff Wendy Gold.

15         MR. BAE:  Good morning, Your Honor, Peter Bae of

16  Davis Wright Tremaine for defendant Eva Naturals.

17         THE COURT:  Anyone else?

18         ALL:  (No verbal response).

19         THE COURT:  All right.  Who will be taking the lead

20  for the defendant this morning?

21         MR. HARPER:  Good morning, Your Honor.  I will.

22  This is Jacob Harper.

23         THE COURT:  Is that H-A-R-P-E-R?

24         MR. HARPER:  It is, exactly right.

25         THE COURT:  All right, Mr. Harper.  And who will be

1    taking the lead for the plaintiff?

2            MR. LIPARI:  I will, Your Honor.  This is Joseph

3    Lipari, L-I-P-A-R-I.

4            THE COURT:  All right, very good.  We are here for a

5    pre-motion conference.  At a pre-motion conference, as you

6    know, anyone can make any motion they want.  I don't stop

7    anyone from making a motion, but I do, as you well know, in my

8    orders and my rules reserve the right to decide some or all of

9    the motion.  If I think it's appropriate, I will deem the

10   motion made based on the submissions of counsel and the

11   arguments you make today, so feel free to argue anything you

12   want to me.  I will say as a preliminary matter that I have

13   looked over the pre-motion submissions and they are quite good

14   and quite helpful, so we may resolve some of this on the phone

15   today, which I think will be helpful.  I also note that we're

16   on the phone because of the continuing of the pandemic, but

17   hopefully that's drawing to a close and we'll see each other

18   like real humans again soon.  So with that said, Mr. Harper,

19   would you like to outline the -- or argue the motion to me,

20   please.

21           MR. HARPER:  Yes, Your Honor, thank you.  As Your

22   Honor is aware, this is a -- it's a mislabeling action over a

23   cosmetic product, or actually it's a whole line of cosmetic

24   products by our company, Eva Naturals.  The plaintiff

25   purchased one of these 25 products.  The product she purchased

1   was called skin firming serum by Eva Naturals, sometime in

2   January 2021.  The plaintiff's claim is pretty

3   straightforward.  She claims that because of the product --

4   it's not actually the product label, it's because of the

5   company's brand {quote} "Eva Naturals", she believes the

6   entire product line is mislabeled because she alleges it

7   contains what she deems synthetic ingredients.

8       Your Honor, we believe there are three grounds for --

9   three general grounds to support a motion to dismiss and we

10  believe those grounds will basically get rid of the entire

11  case, and if not the entire case, a substantial portion of

12  those.  The first ground which we believe removes the entire

13  case is the fact that the term Eva Naturals, as is the

14  defendant's brand, does not support --

15          THE COURT:  Yes.

16          MR. HARPER:  -- a claim under the New York general

17  business statute.  To support a claim under that statute, as

18  you know, Your Honor, the plaintiff must make a claim that a

19  reasonable consumer would be misled by the product.  But we

20  know from the 2nd Circuit as recently as 2020 that in many

21  circumstances, including this one, the context of the entire

22  label on which the plaintiff relied or in this case on the 24,

23  the 25 that the plaintiff did not even read, will support a

24  motion to dismiss because a plaintiff would not have been

25  reasonably misled.  The case I'm referring to, Your Honor --

    1              THE COURT:  Counsel, let me ask you -- counsel,
    2      counsel, counsel, counsel --
    3              MR. HARPER:  Sure.
    4              THE COURT:  -- counsel, let me ask you a question.
    5      How does that differ from the situation in Goldemberg
    6      involving the Aveeno Active Naturals situation?
    7              MR. HARPER:  Well, Your Honor, I guess that off the
    8      top of my head I would say it differs in two ways.  First, as
    9      to the 24 of the 25 products that the plaintiff did not
   10      purchase, she has no standing to raise any claims as to those
   11      24 --
   12              THE COURT:  Different question.  Counsel, counsel,
   13      counsel, counsel --
   14              MR. HARPER:  Sure.
   15              THE COURT:  -- different question, right.
   16              MR. HARPER:  Yes.
   17              THE COURT:  You just said to me that, you know, that
   18      the whole label has to be taken into context and so forth,
   19      when you were describing that aspect of the case.  I
   20      understand your standing issue, and I will get to that, but on
   21      this piece I don't see how Goldemberg is not completely
   22      dispositive of your argument.
   23              MR. HARPER:  Well, Your Honor, I guess Goldemberg
   24      was, I believe, two years before the Axon vs. Citrus World
   25      case that the Supreme Court -- or that the 2nd Circuit had

1    addressed.  The district court case in the case that -- the

2    district court in the case that you had just referenced, Your

3    Honor, did not have the benefit of the 2nd Circuit's decision.

4    The <u>Goldemberg</u> case from the Southern District in 2014 came

5    six years before that.  In addition, the --

6            THE COURT:  Right, but hold on a second, counsel.

7    Let me just ask you --

8            THE COURT:  -- the label -- sure.

9            THE COURT:  -- when you bring up <u>Citrus World</u>,

10   <u>Citrus World</u> is a completely different factual set, right?  In

11   other words, <u>Citrus World</u> involves the orange juice.  If I

12   remember correctly, it has the small taint of some pesticide

13   that was unintentionally there or whatever, or was not

14   detected.  This is different, right?  I mean, this is a lot

15   closer to <u>Goldemberg</u> where you're talking about what's

16   intentionally in the ingredient within the products.  Fair?

17           MR. HARPER:  Well, I think that the key problem

18   resides in the terms.  So we have -- in <u>Goldemberg</u> it was much

19   more -- the Naturals was modified by the term Active, and the

20   court made -- spent a good amount of time analyzing the effect

21   of the term Active Naturals on whether a reasonable person

22   could be misled by the Naturals portion.  In fact, the court

23   noted the Miriam Webster Dictionary definition as to the

24   active portion saying -- asserting that the thing represented

25   by the grammatical subject performs the action represented by

1    the verb, marked by a present operation transaction or use, or

2    capable of being acting or reacting.  And so what the

3    Goldemberg case did was looked at the way the term active

4    interacted with the term Naturals and found that a -- that

5    that was the key in -- the key distinction between the {quote}

6    "Naturals" in Eva Naturals, versus the Naturals in Active

7    Naturals.  I mean, the company in Goldemberg, Johnson &

8    Johnson, relied on the use of the term Active.  I mean, hey,

9    to activate the term Naturals and the court had concluded that

10   that in itself was sufficient to get over a motion to dismiss.

11   We don't have that here.  We have Eva which is a -- you know,

12   it's almost a puffery term that has no similar, I guess,

13   adverbial relationship to the term Naturals.  It's sort of a

14   neutral term.  And that's the problem and that's the main

15   distinction between Goldemberg, where we've got this activated

16   Naturals term that is further inducing the -- inducing

17   consumers to look at Naturals and focus on Naturals and think,

18   oh, well, we've got active natural ingredients here.  They're

19   going to -- it's going to imply something about the

20   ingredients, and to draw a relationship between the term

21   Naturals and the product itself, whereas Eva Naturals is

22   strictly a puffery type consumer brand name that doesn't -- it

23   doesn't try to draw in using another term like Active.  The

24   term --

25             THE COURT:  Yes, so Mr. Harper, let me just give you

1    -- Mr. Harper, let me just tell you --

2           MR. HARPER:  Sure.

3           THE COURT:  -- that was a fine argument on the --

4    you know, on the puffery aspect to this.  And you might want

5    to keep those notes for your jury closing, but I just don't

6    think that's a motion to dismiss argument, you see.

7           MR. HARPER:  Well, again, I think the 2nd Circuit

8    would disagree, Your Honor, and again, the -- I've said this

9    before, Goldemberg did not have the benefit of the 2nd

10   Circuit's guidance.  In fact, the plaintiff's letter cites a

11   number of cases going back -- it looks like the most recent

12   case is 2018, but the majority of those cases are in the 2010

13   to 2015 range, before the -- and unless the plaintiff tells us

14   otherwise, we were not able to find any guidance from the 2nd

15   Circuit except for the Axon vs. Citrus World case which

16   strongly suggests to me as someone from the 9th Circuit where

17   things often don't go our way.  When the circuit court gives

18   us some guidance on the way these reasonable consumer cases

19   go, we probably should pay attention, and I would suggest,

20   Your Honor, that that distinction between Active Naturals and

21   Eva Naturals is not just a jury issue, it's one that the 2nd

22   Circuit would find is something that a reasonable consumer --

23   that the reasonable consumer test would filter out, and it is

24   something appropriate on the motion to dismiss at the Rule 12

25   stage.

1          THE COURT:  Okay.  All right, why don't you tell me
2    about your next argument.
3          MR. HARPER:  Thank you, Your Honor.  The second
4    argument which I started getting into, Your Honor, was the
5    lack of standing for the 23 of the 24 products.
6          THE COURT:  Yes.
7          MR. HARPER:  Your Honor, there is no -- you know, a
8    plaintiff has a right to sue for an injury that the plaintiff
9    has suffered herself, but she's lumped in a whole line of
10   products based on her admission that the only product that she
11   purchased was skin firming serum.  That matters, and it
12   matters particularly at the pleading stage because we have to
13   know -- well, in order to -- first of all, from Your Honor's
14   perspective, the court has to be able to conduct the analysis
15   based on the label on which the plaintiff had relied.  And to
16   unpack that a little bit, I mean, there is no reliance based
17   on the admissions from the complaint on 23 of the 24 products,
18   and so there -- the plaintiff does not meet her statutory and,
19   frankly, Article 1 burden to bring claims there.  But even if
20   we get to the jury stage, Your Honor, we have to know what the
21   context and what those labels as a whole conveyed to the
22   plaintiff and to a reasonable person.  We just can't do that
23   based on labels that, you know, as far as we know from the
24   complaint, the plaintiff has never even seen.  We've -- I will
25   say that in our sort of crazy 9th Circuit, we just -- there is

1  a case addressing this very issue called <u>Lorenzen vs. The</u>

2  <u>Kroger Company</u> in which the District Court held that a

3  plaintiff is entitled to bring suit and has standing to bring

4  suit even in a class action context only as to that product

5  that the plaintiff had purchased, and is not entitled to bring

6  claims and therefore a motion to dismiss is appropriate as to

7  all products that the plaintiff did not purchase.  And I raise

8  that -- it does matter that it's a 9th Circuit -- it's

9  actually a central district of California case from the 9th

10  Circuit, but to make that point, the court relied on two U.S.

11  Supreme Court cases which we cited in our letter.  And just

12  for Your Honor's reference, those cases are -- give me one

13  second, Your Honor.

14          THE COURT:  I was going to say, is --

15          MR. HARPER:  Oh --

16          THE COURT:  Okay, so there was a new case from the

17  Supreme Court, the <u>TransUnion</u> case <u>vs. Ramirez</u> on -- that came

18  out in June this year.

19          MR. HARPER:  Yes, there was Your Honor, and --

20          THE COURT:  Do you think that changes --

21          MR. HARPER:  Yes, Your Honor?

22          THE COURT:  Do you think that changes this argument?

23  In other words, is that (indiscern.).

24          MR. HARPER:  No, I mean, I think it changes it only

25  in that it emphasizes our point.  Your Honor, in the

1    TransUnion case, these issues were raised --

2          THE COURT:  No, I -- look, counsel --

3          MR. HARPER:  Sorry.  Go ahead.

4          THE COURT:  Make no mistake, counsel, it might help

5    you, I understand.  It's a complicated issue.

6          MR. HARPER:  Yes.

7          THE COURT:  Until -- you know, I look at my notes

8    this morning on this, you know, I'd have -- I didn't think

9    about that.  That's something new we're trying to apply in a

10   variety of circumstances.

11         MR. HARPER:  Yes.

12         THE COURT:  I don't know how it's going to affect

13   it.  That's really interesting.

14         MR. HARPER:  Well, Your Honor, I know we raised it

15   in another -- in a privacy class action, you know, that case

16   came up on a Friday and our reply in that -- on our motion to

17   dismiss in that other case was due on a Monday.  We added it

18   in over the weekend.  You know, TransUnion the posture was at

19   the class certification stage, I believe, but the court's

20   point applied as a matter of standing, it wasn't strictly as a

21   matter of class certification.  I know the plaintiffs in their

22   response letter made some reference to the fact that the

23   standing issues may come up as a class certification issue,

24   but I don't think that's true in this case.  Standing is

25   standing, and that's an Article 1 issue that is appropriate on

1    a 12(b)(1) motion.  I think <u>TransUnion</u> only serves to

2    emphasize the fact that plaintiff -- well, neither the

3    plaintiff nor the putative class members may have a class or a

4    case on their behalf go forward absent an actual injury.

5             THE COURT:  Right.

6             MR. HARPER:  And I think the way to think about

7    <u>TransUnion</u> is <u>TransUnion</u> makes that point as to the absent

8    class members.  But what's good for the absent class members

9    is also good for the -- or particularly good for the putative

10   class representative.  If the class representative doesn't

11   have standing, they can't represent the class members, and if

12   class members themselves don't have standing and the putative

13   class member is a member of that class, and that putative

14   class -- that putative class representative does not have

15   standing either.  So I think Your Honor is absolutely right to

16   point out that <u>TransUnion</u> does serve to help us and emphasize

17   these other two Supreme Court cases that we cited.

18             THE COURT:  Again, counsel, help me --

19             MR. HARPER:  Your Honor --

20             THE COURT:  -- help me just --

21             MR. HARPER:  Sure.

22             THE COURT:  -- help me just to understand something.

23   So imagine, and I know coming from the 9th Circuit -- and by

24   the way there is a transcript being made of this, right, so be

25   careful.

1          MR. HARPER:  Yes.

2          THE COURT:  But I understand that your home court

3     sometimes goes a different way.  But imagine that the claims

4     survive here, or some of the -- one or more of the claims

5     survive here.  But you're right about the standing, she has no

6     standing on the other 24 of 25 products, if I have that number

7     right.  Let's assume that's right.

8          MR. HARPER:  Sure.

9          THE COURT:  If she goes forward and eventually gets

10    the class certification, I presume the bazillion class members

11    who join the case will have bought the other 24 of 25, and

12    then they'd have the right to amend, right?  I mean, is this

13    sort of the game not worth being -- not worth the candle kind

14    of scenario?

15          MR. HARPER:  No, I don't think so, Your Honor.  I

16    don't think so, Your Honor, because the -- this class member

17    wouldn't have -- I don't think that -- I guess if I think

18    about the analysis this way, one reason in a mislabeling

19    lawsuit we have these standing and reliance requirements is

20    again the labels matter.  And it's not necessarily true and

21    often provably untrue that one plaintiff's reliance and one

22    class representative's reliance on a particular label is

23    consistent or typical or common using class certification

24    parlance with other members of the class in terms of other

25    labels that they relied on.  So, you know, if Eva Gold -- if

1    Ms. Gold had other putative class members that purchased other
2    products, then that may be -- you know, then they're free to
3    add other class representatives that would be able to
4    represent those other members.  I think the point here is
5    presumptively Ms. Gold can't represent other class members
6    that purchased these products, nor could she try to fix that
7    problem by purchasing a whole bunch of products after the fact
8    because that undermines her reliance argument.  So I don't
9    think it's -- I think it actually is a valuable exercise to
10   undergo.  I mean, among other things, as Your Honor is aware
11   from these consumer class actions, part of the game is driving
12   up the discovery costs and sort of turning these at the outset
13   as broad as possible in trying to leverage the defendant.  But
14   if you sort of bring these down to what really matters, to one
15   particular plaintiff and the more narrow set of other possible
16   plaintiffs that she could plausibly represent, then it makes
17   the case much more grounded in reality and much less of a
18   speculative leverage game.  And so with -- in that sense, I
19   think it's absolutely worthwhile to go through the exercise of
20   trying to pare this down to -- well, in our view, paring it
21   down to a full dismissal, but at a minimum, paring it down to
22   a set of products that the plaintiff actually has some
23   standing to represent on a going-forward basis so that if we
24   need to get rid of this at the motion to dismiss -- or I'm
25   sorry, at the summary judgment stage or somewhere else that

1   requires a little bit more factual analysis, then we do that

2   in a more narrow, realistic scope.

3          THE COURT:  Okay.  All right, what else would you

4   like to argue to me today?

5          MR. HARPER:  Last, quickly, third argument is we

6   don't believe Ms. Gold has standing to assert injunctive

7   relief.  She has stated in -- as we read her complaint as

8   stating that she will not be purchasing this product anymore

9   and as Your Honor is aware, when you don't -- when you express

10  your intent not to purchase a product, then you have no more

11  standing to bring injunctive relief.

12      So Your Honor, just to close quickly, I think we believe

13  -- we intend to move broadly on all of these.  We think at

14  least there is a plausible argument that the entire case goes

15  away based on the plaintiff's failure to meet the reasonable

16  consumer standard, at least as alleged in the complaint.  If

17  Your Honor is not going to dismiss the entire case, we think

18  at a minimum the 23 of the -- Ms. Gold does not have standing

19  to assert the claims as to 23 of the 24.  We may frame that as

20  a motion to dismiss; we may frame it as a motion to strike

21  that is coupled with a motion to dismiss, but either way these

22  claims should be pared down to the one particular item that

23  she actually purchased --

24          THE COURT:  Okay.

25          MR. HARPER:  -- with the label on which she

 1    allegedly relied, and then in any case we don't believe she

 2    has standing to assert injunctive relief.  Thank you.

 3        THE COURT:  All right, thank you.  Let me hear from

 4    your adversary.  What would you like to address?  And feel

 5    free to address anything that came up today or came up in the

 6    filings.

 7        MR. LIPARI:  Sure, Your Honor.  So with respect to

 8    the first argument, I think Your Honor is exactly right, that

 9    Goldemberg is not in any way distinguishable.  In fact, it's

10    right on point.  And counsel indicated that there was

11    apparently some deep-dive analysis, grammatical analysis of

12    Active Naturals, and what does Active mean, et cetera.  But if

13    we look at the motion to dismiss opinion by Judge Román, it

14    was fairly simple and fairly straightforward.  The court

15    simply found that notwithstanding the word Naturals being part

16    of the brand or part of the trademark, and not even

17    necessarily, you know, something separate and apart from

18    branding or a trademark, the court could not rule as a matter

19    of law that no reasonable consumer would be misled.  So, I

20    mean, similarly here, we have Eva Naturals.  And I think the

21    case law is really clear in the 2nd Circuit, and we've cited a

22    bunch of cases, that a court cannot rule as a matter of law

23    that a reasonable consumer could not be misled by a Natural

24    appearing in the brand or the trademark.

25        THE COURT:  All right, so Mr. Lipari, let's assume,

1    as you might have guessed, you had me at hello on that, all

2    right?  So we'll move forward from there, yes?

3            MR. LIPARI:  Yes.  Yes.

4            THE COURT:  Okay.  Help me with standing, though.

5    How would you use the standing to sue on the 24 of the 25

6    products that your client didn't buy?

7            MR. LIPARI:  So, Your Honor, I think counsel

8    referred generally to a 9th Circuit case, and counsel referred

9    generally to what TransUnion might stand for.  But Your Honor,

10   in the 2nd Circuit, the law is fairly clear.  If we look, for

11   instance, at a case called Buonasera vs. Honest, where -- and

12   this is an SDNY 2016 case.  It's 2000 -- I'm sorry, 208

13   F.Supp.3d 555.  And in that particular case, plaintiff in this

14   putative class action sued as a class action plaintiff as a

15   result of purchasing one of the shampoos or the skin creams,

16   but then there was a whole product portfolio that he had not

17   purchased.  And in that particular case, Your Honor, it was

18   dealt with as follows:  the court indicated that a plaintiff

19   has standing to bring suit for products not purchased if she

20   personally suffered injury as a result of defendant's conduct

21   and such conduct implicates the same set of concerns as the

22   conduct alleged to have caused injury to other members of the

23   putative class.  So here, Your Honor --

24           THE COURT:  Counsel, Mr. Lipari, have you read --

25   Mr. Lipari, have you read the TransUnion decision we were just

1    talking about?

2              MR. LIPARI:  I have, Your Honor.

3              THE COURT:  And what do you think, did that change

4    that analysis, or might that change that analysis?

5              MR. LIPARI:  Your Honor, I mean, it would really

6    have to be developed because -- you know, through subsequent

7    case law.  Because at this point, from our --

8              THE COURT:  Mr. Lipari, Mr. Lipari, I'm smiling only

9    because we're not in person.  I just want to say to you, I

10   wonder who has to do that?  Oh, right, that's what they pay me

11   for, I've got to figure out what do we do now.

12             MR. LIPARI:  Right.  Your Honor, exactly.  My point,

13   Your Honor, is having read the TransUnion case, it seems

14   completely distinguishable and inapposite.  And there what we

15   were talking about was whether or not in a data breach case

16   there was a concrete injury when a consumer's data, you know,

17   was breached and was vulnerable and was susceptible to being,

18   you know, distributed or disseminated, but there was no actual

19   concrete harm, and assessing standing from that perspective.

20   Here on the other hand we unquestionably have a situation

21   where Ms. Gold, you know, we allege, was deceived as a result

22   of the on-label misrepresentation.  So there was

23   unquestionably a concrete harm in the sense that she was

24   induced to purchase a product based upon misrepresentations

25   and she paid money for a product that she otherwise wouldn't

1    have purchased.  So, I mean, I just look at that standing

2    issue as very distinguishable from the issue in <u>TransUnion</u>

3    where we're talking about -- which is sort of, as Your Honor

4    may know, I think the precursor to that was <u>Spokeo</u>, the <u>Spokeo</u>

5    case, and essentially whether just sort of like this, you

6    know, kind of injury in theory but not an actual concrete harm

7    confer the standing on a plaintiff.  So I really just don't

8    look at the <u>TransUnion</u> case as on point, and frankly I don't

9    even look at it as helpful in this analysis.

10        THE COURT:  Well, maybe you're right, maybe you're

11    wrong, I don't know.  I have grave misgivings on that

12    particular point.  But let me go on to a few other things I

13    need you to address, please, if I may.  Counsel didn't raise

14    this, but the territoriality requirement.  Are you looking to

15    certify a class beyond the borders of New York State, and if

16    so, what basis do you have to do so?

17        MR. LIPARI:  Your Honor, yes, we would want to

18    certify a subclass of -- it's a New York subclass only with

19    respect to those GBL claims.  So we would concede at this

20    point that, you know, if they were not New York residents or

21    they didn't view or purchase the products in New York, then at

22    least, the way we're framing our complaint, the GBL would be

23    inapplicable in that situation.  So that's why it would be a

24    New York only subclass for the GBL claims.

25        THE COURT:  Okay.  But on the -- you think on the

1    express warranty you can go beyond the state boundaries, yes?

2                MR. LIPARI:  We do, Your Honor.

3                THE COURT:  Okay.  That's only troubling from a case

4    management standpoint.  I don't know that you're legally

5    incorrect but, you know, it injures sort of the scope of what

6    we're going to do here (indiscern.) --

7                MR. LIPARI:  Well, Your Honor -- oh, I'm sorry to

8    cut you off, Your Honor, I --

9                THE COURT:  No, no, no, no, you didn't.

10               MR. LIPARI:  -- it's just difficult on the phone.  I

11   was simply going to say, Your Honor, you know, respectfully,

12   we don't view that as a motion to dismiss a 12(b)(6) issue, we

13   view that, as I think Your Honor was alluding to, as a case

14   management issue at the certification phase.

15               THE COURT:  Aptly fair.  Is counsel correct that if

16   your GBL 349 and 350 claims go forward then I should dismiss

17   the unjust enrichment as duplicative?  And I think I know the

18   answer, but I'll give you a chance to persuade me otherwise.

19               MR. LIPARI:  Sure.  So Your Honor, we would make two

20   points on that.  The first is we would be entitled, at least

21   at this stage, to go forward with that claim in the

22   alternative.  But, you know, I suppose then in the event that

23   there's no need for alternative pleading because then the GBL

24   claims do in fact go forward, then our argument in that

25   respect would be these are different claims that have

1     different factors associated with those claims.  So, you know,
2     an unjust enrichment claim --

3                THE COURT:  Okay.

4                MR. LIPARI:  Oh, okay.

5                THE COURT:  I hear you, I hear you.  I was just
6     going to say, the Goldemberg case that you would have me to
7     adhere to carefully did dismiss the express warranty claims,
8     fair?

9                MR. LIPARI:  It did, Your Honor, 100%.

10               THE COURT:  Yes, okay.  I think I know what to do
11    there.  All right, are we agreed on the injunctive relief
12    piece or do you read those 2nd Circuit cases somehow
13    differently here?

14               MR. LIPARI:  Your Honor, we would be willing to
15    withdraw that portion of our complaint with respect to Ms.
16    Gold seeking injunctive relief, you know, in view of that
17    Birney case.

18               THE COURT:  That application is granted.  We're
19    making progress already.  The injunctive relief portion is
20    withdrawn.  Please note that.  All right, good.  And then
21    there's standing I think we spoke about.  Anything else you
22    want to address with me today?

23               MR. HARPER:  Is this for both of us, Your Honor, or
24    just for the (indiscern.)?

25               THE COURT:  Well, let me tell -- let me see if Mr.

1    Lipari is done and Mr. Harper, I'll let you respond in a

2    moment.

3              MR. HARPER:  Okay.

4              THE COURT:  So Mr. Lipari, anything else?

5              MR. LIPARI:  Your Honor, bear with me one moment,

6    I'm just flipping through my notes.

7              THE COURT:  Take your time.  You've done a

8    delightful job so far, so please -- everyone has, so please

9    continue.

10             MR. LIPARI:  Okay, Your Honor, yes, I thought -- I

11   just wanted to clarify something.  So Your Honor was asking me

12   a question about unjust enrichment and whether or not the

13   Goldemberg court dismissed -- well, I thought Your Honor was

14   asking me if the Goldemberg court dismissed the unjust

15   enrichment cause of action, so that's why I answered in the

16   affirmative, because I believe they did.  However, I'm looking

17   at the case with Goldemberg.  They kept the breach of express

18   warranty claim, because I think Your Honor actually asked me -

19   -

20             THE COURT:  Oh, yes.

21             MR. LIPARI:  -- about the breach of express warranty

22   claim.

23             THE COURT:  Yes, but not in that context.  I was

24   just talking about the unjust enrichment being duplicative,

25   but yes, thank you.  I think I'm good on that part.

1          MR. LIPARI:  Okay, sure.  Yes.

2          THE COURT:  Anything else?

3          MR. LIPARI:  I have nothing further then, Your

4     Honor.  No, no, Your Honor.

5          THE COURT:  All right, great job, Mr. Lipari.  Mr.

6     Harper, anything else you want to respond to?

7          MR. HARPER:  Yes, Your Honor, just very, very

8     quickly.  On the point about --

9          THE COURT:  Take -- no, Mr. -- wait, Mr. Harper,

10    hold on.  Mr. Harper, take your time.

11         MR. HARPER:  Sure.

12         THE COURT:  And not rush.  Go ahead.

13         MR. HARPER:  Okay.  I'll still be quick to save

14    everyone some time.  I do want to remind Your Honor, as you

15    are aware, that the 2nd Circuit has held that it is {quote}

16    "well settled that a court may determine as a matter of law

17    that an allegedly deceptive advertisement or business practice

18    would not have misled a reasonable consumer" {end quote}.  And

19    that's Fink vs. Time Warner 714 F.3d 739.

20         THE COURT:  Got it.

21         MR. HARPER:  I -- just putting that out there as a

22    friendly reminder that this is a subject that is viable for a

23    motion to dismiss, at least as a procedural matter.

24         THE COURT:  Good.

25         MR. HARPER:  On the TransUnion and standing issue as

1    to the other 23 or 24 products, we were referencing --

2    opposing counsel noted that we had mentioned 9th Circuit

3    cases, but I -- the cases, again, were relying on U.S. Supreme

4    Court precedent.  As we noted in our briefing, the two cases

5    that apply including to the 2nd Circuit are <u>Blum vs. Yaretsky</u>,

6    457 U.S. 991, and the pin cite is at 999.  That's a 1982 case.

7    In the context of a -- in a class action, the Supreme Court

8    noted that {quote} "it is not enough that the conduct of which

9    the plaintiff complains will injure someone" {end quote}.

10   Another quote, "nor does the plaintiff who has been subject to

11   injurious conduct of one kind possess by virtue of that injury

12   the necessary stake in litigating conduct of another kind,

13   although similar, to which he has not been subject" {end

14   quote}.  Your Honor, we believe here, as it did in the

15   <u>Lorenzen</u> case that we noted earlier, that plaintiff's attempt

16   to use standing for one product to stand in as a class

17   representative on behalf of purchasers of 23 separate and

18   different products violates <u>Blum</u> and violates the standing

19   requirements under Article 1.  The other case that would apply

20   here is called <u>Lewis vs. Casey</u>, 518 U.S. 343, and that case

21   states {quote} "that a suit may be a class action, ... adds

22   nothing to the question of standing, for even named plaintiffs

23   who represent a class 'must allege and show that they have

24   personally been injured, not that the injury has been suffered

25   by other, unidentified members of the class to which they

1   belong and which they purport to represent.'" {end quote}.

2   Your Honor, with those two cases in mind, it seems TransUnion

3   doesn't change anything.  As Your Honor suggested, it actually

4   helps sort of define it further and gives further ammunition

5   to the fact that Ms. Gold's possible standing to assert claims

6   for one product is not for standing over others.  There are

7   additional case management issues that would apply in the

8   class context but from our perspective she does not even have

9   standing in the first instant to raise claims there and that's

10  something appropriate for a motion to dismiss.  Your Honor, I

11  do support Your Honor's reference of the extraterritoriality

12  issues which we raised in the letter, but -- and we would

13  raise those issues in the motion to dismiss depending on the

14  scope of -- it sounds like the plaintiff may be narrowing the

15  complaint at least somewhat with respect to injunctive relief

16  and we would --

17          THE COURT:  Well, so wait, let me ask a question,

18  counsel.

19          MR. HARPER:  Sure.

20          THE COURT:  On the express warranty claim, is there

21  a basis to say at this juncture that the class must be limited

22  to the state boundaries?

23          MR. HARPER:  I believe there is, but Your Honor, I

24  can't say off the top of my head that I've researched that

25  particular issue in a lot of detail.

1           THE COURT:  Okay.

2           MR. HARPER:  I believe that it would be.  I believe

3   that express warranty claims would be a terminus with the 350

4   claims, but --

5           THE COURT:  Okay.

6           MR. HARPER:  -- it's something I would need to

7   consider a little bit more.

8           THE COURT:  Okay, very good.  All right, I am going

9   to rule in part today, so let me go ahead and set that on the

10  record.  And there is a -- we're making a recording of this

11  and may need to transcribe.  It will be available.  So as set

12  forth in rule 2(e)(1) of my individual rules, the Court

13  reserves the discretion to construe the pre-motion letters

14  along with counsel's arguments as the motion itself.  As noted

15  in that rule, this procedure has been upheld by the 2nd

16  Circuit under appropriate circumstances.  The exercise at such

17  discretion is rendered more appropriate by the existence of

18  the individual rule and the orders that I've issued putting

19  counsel on notice of it, which effectively put counsel on

20  notice of the possibility that I would rule today.  This

21  motion that is to dismiss, I'm going to deem the motion made

22  in part, and I'll explain as I go along.  But the motion to

23  dismiss is decided under the well-established standards of

24  review for such matters as discussed in many cases, but I'll

25  cite one, Burris vs. Nassau County District Attorney, 2017

1    Westlaw 9485714 at *3 to 4, which I'm incorporating herein by

2    reference solely for the purpose of establishing the well

3    known standards for a motion to dismiss.  But as counsel well

4    knows, the Court is required to decide, assuming the

5    allegations to be true for the purposes of the motion only,

6    whether there are sufficient facts to determine whether

7    plaintiff has alleged a plausible claim or plausible claims on

8    their face.  Based on review of the complaint and after

9    considering the arguments of counsel, I find that the

10   complaint does, in part, state sufficient fact to state

11   plausible claims, and in other parts I find it insufficient,

12   and I'll set those out.

13        So we'll begin at the beginning.  I believe that there is

14   sufficient factual information on the general business law New

15   York State §349 deceptive practice claim.  Assuming the facts

16   to be true, I do find that claim plausible.  And we had a lot

17   of discussion about this, but I'll just point out that once

18   again I find the Goldemberg case, which is at 8 F.Supp 3d.

19   467, on all fours and quite helpful, and that was the Aveeno

20   Active Naturals case and I believe very analogous to the case

21   at bar, and in that case the court denied a motion to dismiss

22   the 349 claim.

23        Now defendants point me to the Axon vs. Citrus World

24   case, which is at 354 F.3d 170.  Now while that's helpful to a

25   degree, I would note that the very first proposition set forth

1    by the court is as follows, and I'm going to quote the case

2    here.  It's {quote}, "We agree with the district court that

3    the presence of glyphosate", G-L-Y-P-H-O-S-A-T-E, "as a

4    contaminant in defendant's product, rather than an

5    intentionally-added ingredient, bolsters the conclusion that a

6    reasonable consumer, viewing the brand name Florida Naturals -

7    - or Florida's Natural", sorry, "would not make assumptions

8    regarding the presence or absence of a trace amount of

9    glyphosate", and that's at Axon 354 F.Supp.3d at 183.  Now I

10   would add that defendant has pointed out to me that it may

11   well be within the court's discretion to make the

12   determination as to whether or not a consumer would be

13   defrauded on its face.  To the extent that it is within my

14   discretion, I decline to exercise that discretion at this

15   time.  It's in light of the teachings of Goldemberg and I

16   believe the distinguishing factors of Axon.  So the 349 claim

17   will go forward.

18        I also find that there is a sufficient basis on the 350

19   claim and so that one will go, a false advertising claim under

20   New York State general business law as well, and there I just

21   point the parties, just because it's slightly helpful, to

22   Silva vs. Smucker Natural Foods which is at 2015 Westlaw

23   5360022, which was the Natural Brew Root Beer case.  So I

24   believe with regard to -- and everything I just said applies

25   to the one product the plaintiff purchased.  We'll come back

1    to the rest in a moment.  And then we've already agreed that

2    the class to the extent there may be a class will be limited

3    to New York state as to those two claims, so that's no longer

4    an issue.  And then the unjust enrichment claim I also find is

5    duplicative and should be dismissed.  And I'll once again cite

6    the Goldemberg case which did exactly that.  So I'm going to

7    dismiss unjust enrichment.  Plaintiff's counsel had kindly

8    withdrawn the injunctive relief question.  Thank you for that,

9    that makes it quite a lot easier to go forward because there's

10   lots and lots of new precedents regarding that issue, and I

11   think Plaintiff was -- Plaintiff's counsel was correct in

12   doing so.

13        That leaves me with the issue of standing.  So that's my

14   ruling on the motion to dismiss up to this point.  On

15   standing, this is a very complex question which I find has

16   been further complicated by the advent of the TransUnion case.

17   I've been trying to figure out exactly how that would apply

18   and how that's going to work in this context.  I need some

19   more help, so I'm going to ask the parties to brief only that

20   issue now that I've decided everything else, I believe, but

21   I'm going to ask you to brief this standing issue.  I think a

22   relatively brief brief -- I did say that word twice, that's

23   not an error -- would be helpful.  I'm thinking something on

24   the order of ten pages, but counsel could persuade me

25   otherwise, because I will note that it is a complex issue.

1   What do you say about that?  Tell me what you think about that
2   page limit and tell me when you can get those briefs in.
3          MR. LIPARI:  Your Honor, I'm sorry, can you repeat
4   the page limit?
5          THE COURT:  I was saying ten.
6          MR. LIPARI:  Ten works for plaintiff, Your Honor.
7   And if we could do two weeks.
8          THE COURT:  How about defendant?
9          MR. HARPER:  I think we can do ten.  Is Your Honor
10  envisioning cross briefing or how does Your Honor believe we
11  should be doing it?
12         THE COURT:  I mean, I -- you know what, look, in
13  light of the newly developed case law, I guess we should do it
14  that way.  So let me ask you, then, when can you get your
15  moving brief in on the standing issue?  And of course, I'm
16  talking about standing on the 25 -- 24 products not purchased
17  by plaintiff.
18         MR. HARPER:  Sure.  Your Honor, I would -- let's
19  see.  I'm just looking at my calendar.  The -- two weeks puts
20  us at the first week of August, and next week is pretty busy.
21  Would you mind if we do it three weeks to August 9th, Your
22  Honor?
23         THE COURT:  Counsel, we just got through a pandemic,
24  so I'm feeling very generous, so yes, absolutely.  August 9th
25  is terrific, okay?

1          MR. HARPER:  All right.

2          THE COURT:  And let me ask plaintiff's counsel, how

3     long would you like to respond to that?  When do you want to

4     respond to that by?

5          MR. LIPARI:  Okay, bear with me one moment, Your

6     Honor.  I'm just looking at my calendar.

7          THE COURT:  And make it convenient, please.  I don't

8     want to put you in a hard spot.

9          MR. LIPARI:  August 30th, Your Honor?

10          THE COURT:  August 30th would be fine, and a week

11     thereafter if they wish, defendant may write me a very brief

12     letter in reply, but make it very, like three pages or less,

13     all right?

14          MR. HARPER:  Thank you, Your Honor.

15          THE COURT:  All right.  And so this way -- and I

16     will ask you to follow the bundling rule, so just send that to

17     each other and then get it to me in September, and I will turn

18     to this very interesting issue.  But before I let you go and

19     while we're all together, first of all let me make sure, is

20     there anything I didn't resolve based on the anticipated

21     motions and so forth, other than obviously the standing piece?

22          MR. HARPER:  I don't believe so, Your Honor.  Not

23     from our perspective.

24          THE COURT:  Okay.  And I'll ask this, and both of

25     you, and plaintiff, you can answer, anything -- is there

1    anything else we need to do today while we're together?

2               MR. LIPARI:  Not from plaintiff's perspective, Your

3    Honor.  Thank you.

4               THE COURT:  Okay, and defendant, anything else?

5               MR. HARPER:  No, Your Honor.  No, Your Honor.

6               THE COURT:  All right, counsel, let me say, I meant

7    what I said, you both did a fine job today.  These are

8    complicated issues and you helped make them simple and I'm

9    grateful for that.  So I look forward to your poignant briefs

10   that shall follow in September and we'll get to this other

11   very interesting issue in the case.  All right, have a nice

12   day.

13              MR. HARPER:  Thank you, Your Honor, appreciate it.

14              MR. LIPARI:  Thank you very much.

15              THE COURT:  All right, we're adjourned.  Take care.

16        (Court adjourned)

17

18                         CERTIFICATION
19   I certify that the foregoing is a correct transcript from the
20   electronic sound recording of the proceedings in the above-
21   entitled matter.
22
23
24   *Lewis Parham*                          7/23/21
25
26   _____        _____
27   Signature of Transcriber              Date